UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| REBECCA DOOLIN, ) | |
| ) | |
| Plaintiff, ) | Civil No. 9-425-GFVT |
| ) | |
| V. ) | |
| ) | |
| HINKLE CONTRACTING CORP., ) | **MEMORANDUM OPINION** |
| ) | **&** |
| Defendant. ) | **ORDER** |
| ) | |
| ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case arises out of Rebecca Doolin's pregnancy, her termination from employment with Hinkle Contracting Corp., and the potential unlawful connection between the two. Relying on such a connection, Doolin brought the current action against Hinkle for pregnancy discrimination under both federal and state law[1], as well as an FMLA action and a breach of contract claim. Hinkle has moved for summary judgment [R. 25], and the matter is now ripe for review. For the reasons stated herein, Hinkle's motion will be granted in part and denied in part.

**I.**

In February of 2007, Doolin was hired by Hinkle, a construction contracting company, to

---

[1] The Kentucky discrimination claim under KRS § 344.040 and its accompanying analysis mirror the federal standard under Title VII. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) ("Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 ("Title VII"), we use the federal standards for evaluating race discrimination claims.") (citing *Kentucky Commission of Human Rights v. Kentucky*, 586 S.W.2d 270, 271 (Ky. Ct. App. 1979); *Bergman v. Baptist Healthcare System, Inc.*, 344 F.Supp.3d 998, 1000-01 (W.D. Ky. 2006) (applying the Title VII analysis for a pregnancy discrimination claim brought under KRS § 344 and Title VII). As a result, the Court will refer only to the federal standard throughout this opinion; the fate of the Kentucky claim is tied directly to the federal claim.

work as a truck driver trainee.[2]  Although the primary responsibility of such a trainee is driving a truck, the job also requires the completion of other related responsibilities such as "flagging." An individual is flagging when he stands at the perimeter of a road construction site and holds up a sign signaling to oncoming traffic that they need to stop or slow down.

Doolin worked as a Hinkle employee largely without incident for a year until, in February of 2008, she notified her superiors that she was pregnant and that her baby was due on October 7, 2008.  These superiors included Bernard Benningfield, the project superintendent and Doolin's immediate supervisor; Jim Wright, Director of Human Resources; and Sam Beverage, the manager of the larger highway project on which Doolin was working.  According to Doolin, within two weeks of her providing such notice, her job responsibilities began changing.  These changes included more physically demanding tasks and a dramatic increase in the amount of time Doolin spent flagging, a task held in little regard by Doolin.

In mid-March, Doolin was approached by Wright, the HR manager, and instructed that Wright *needed* a letter from Doolin's doctor outlining exactly what restrictions she was under during her pregnancy.  According to Doolin, Wright informed her that, "when you go to the doctor next I need a letter stating the restrictions you have and what restrictions you don't have and if you are able to drive a truck." [R. 29-1 at 9].  Wright made his demand without any prompting from Doolin or other indication that her pregnancy would require her employment tasks to be restricted.

Doolin complied with Wright's order and visited her doctor, Dr. Cunningham, on March

---

[2] Because the Court is required to draw all reasonable inferences in favor of Doolin at this stage of the litigation, *see infra* Part II, this factual outline is largely reflective of the facts as set forth in the evidence supporting Doolin's case.  Hinkle, for its part, largely refutes much of Doolin's account, including the issue of whether Doolin was fired or voluntarily quit.

28. After examining Doolin, Dr. Cunningham provided the necessary letter. Contained therein was a general restriction against working overtime and an order limiting the amount of heavy physical work Doolin was to perform; she was not to lift over 25 pounds. Doolin was not restricted from continuing to drive a truck. She returned to work and gave the note to Sam Beverage, the project manager. A few weeks later, on April 17, Doolin was again approached by Wright who told her that he and Beverage were concerned about a decline in Doolin's load counts (the amount of debris carried by Doolin while driving the truck). Doolin alleges that her load counts could not accurately be compared to other drivers on account of the fact that her job responsibilities had recently changed after she became pregnant.

More importantly, Doolin alleges that at that same meeting Wright told Doolin that she "*needed* to get a statement from [her] doctor releasing [her] off work and if [she] didn't then Hinkle would take [her] off work when they thought it was right." [R. 29-1 at 9] (emphasis added). Doolin stated that Wright added "that his personal thought about it is if it was his wife he wouldn't want her working in a place like this while she was pregnant." [*Id*.]. Doolin responded "that [she] really didn't have a choice that [she] had a family to take care of and [she] needed to work and that [she] didn't have any problems working." [*Id*. at 9 and 10].

Less than one week later, on April 23, Doolin was flagging when she began experiencing pain in her stomach. She advised Beverage that she was in extreme discomfort and Beverage told her to go home. The next morning, Doolin called Beverage to see where she would be working and Beverage told her, "that [she] was not to return back to work due to [her] pregnancy and that [she] needed to see a doctor and have the doctor put [her] off for good." [R. 29-2 at 11]. Beverage's instruction was essentially an order discharging Doolin as she was not permitted to work prior to bringing in a note, and once she did bring in the required note, she would no longer

3

be able to perform her job.

Having been told twice that a note from her doctor stating she could no longer work was required, including one time where she was told that she could not come back to work until having procured such a note, Doolin visited her doctor. On April 25, Dr. Cunningham saw Doolin and wrote the following note: "Rebecca [Doolin] is to be off of work with medical leave effective now until 6 weeks after deliv.- her EDD (expected date of delivery) is 10-7-08." [R. 29-5]. While Dr. Cunningham does not remember the visit, his notes recording the visit indicate that Doolin asked him "to be taken off work." [R. 29-6 at 8]. This is consistent with Doolin's account of the fact that both Wright and Beverage told her that she must ask her doctor for a note requiring such a restriction.

On the same day, Doolin visited the worksite, found Sam Beverage, and gave him Dr. Cunningham's note stating that she was not to work until six weeks after her child's birth. Despite the language contained in the letter, Doolin pled with Beverage to allow her to continue working:

> And I was like . . . listen and [disability] is not very much pay at all. I was like listen let me, let me work and they just wasn't going to have it. You know I tried to get them to let me work until July, August and then I'd take off, have the baby and be back and they said no we are not doing that, you know.

[R. 29-1 at 12]. Doolin was told that she would not be allowed to continue working.

Just five days later, on April 30, Doolin called her doctor. Dr. Cunningham's records reflect the content of their conversation. Doolin stated to Dr. Cunningham that she "wanted to work Hinkle," but was now seeking permission to work at a daycare. [R. 29-7]. Dr. Cunningham approved Doolin's request so long as she did not engage in heavy lifting. [R. 29-7; R. 29-6 at 9]. This is essentially the same restriction Doolin was placed on in March by Dr.

4

Cunningham before Doolin explicitly asked him for a note stating that she could not work at all. Doolin never actually worked at a daycare.

Months later, Doolin had her child on September 23, 2008. After she was cleared by her medical advisors to work again, she contacted Hinkle in November of 2008 to get her old job back. Based on the alleged statements of her immediate supervisor, Bernard Benningfield, promising that she would be able to get her job back, Doolin believed that this would be routine. She was mistaken. Citing the state of the economy in autumn of 2008, Hinkle advised Doolin that they were not hiring at that time and they were not going to re-hire her. This litigation ensued.

Relying on the above facts, Doolin brings claims of pregnancy discrimination, FMLA violation, and breach of contract. Hinkle has moved for summary judgment on each of those claims, seeking dismissal of the suit in its entirety. Because the Court only partially agrees with Hinkle, its motion will be denied in part and granted in part for the reasons set forth below.

**II.**

Hinkle seeks summary judgment under Federal Rule of Procedure 56. Pursuant to Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D.Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding,* 285 F.3d 415, 424 (6th. Cir. 2002). Moreover, the movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Holding Hall*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Holding Hall*, 285 F.3d at 424 (internal citations omitted).

Finally, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact" and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). In reviewing a motion for summary judgment, the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

### III.

Doolin brings her pregnancy discrimination claim under 42 U.S.C. § 2000e-2(1)(1),

which states in relevant part, "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Further, "because of sex" includes discrimination "on the basis of pregnancy." 42 U.S.C. § 2000e(k).

There are two methods an individual can prove discrimination under the Act, and Doolin argues in her Response that she has satisfied both methods. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). The first, and more typical method of proving discrimination is through the use of circumstantial evidence in a burden-shifting test known as the "McDonnell Douglas Test" first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Smith*, 155 F.3d at 805. The second, and rarer method of proving discrimination, is through the use of direct evidence that shows the employer had a "discriminatory motive" when it made the challenged employment decision. *Id*. Here, the Court finds it unnecessary to consider the McDonnell Douglas Test because this is the uncommon case where a plaintiff has sufficiently put forward direct evidence of the employer's discriminatory motive in terminating her (the "employment decision" in this case). *See Kline v. Tennessee Valley Authority*, 128 F.3d 337, 349 (6th Cir. 1997) ("If a plaintiff can produce direct evidence of discrimination then the *McDonnell Douglas-Burdine* paradigm is of no consequence").

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). It is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales*

*Corp.*, 176 F.3d 921, 926 (6th Cir.1999). "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith*, 155 F.3d at 805. "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." *Laderach*, 207 F.3d at 829. (citation omitted).

Here, there are two key occurrences of direct evidence of discrimination and they both involve Hinkle's insistence that Doolin provide a note from her doctor stating that she could no longer work. On April 17, Jim Wright approached Doolin and told her that she "*needed* to get a statement from [her] doctor releasing [her] off work and if [she] didn't then Hinkle would take [her] off work when they thought it was right." [R. 29-1 at 9] (emphasis added). More importantly, Doolin testified that on April 24, "Sam Beverage told [her] that [she] was not to return back to work due to [her] pregnancy and that I needed to see a doctor and have the doctor put me off for good." [R. 29-2 at 11].

Both of these statements are in the same vein as the quintessential "I fired you because you are pregnant" type of direct evidence. In the case of Wright's statement, he simply added a layer between himself and Doolin's firing. Rather than say, "I am going to fire you because you are pregnant," Wright essentially said, "Because you are pregnant, you must go get a note from your doctor stating that you cannot work, and once you have done so, I will rely on that note to fire you."

Jim Wright was treating Doolin differently because she was pregnant. His own deposition testimony reflects as much. When discussing his steadfastness in requiring Doolin to get a note from her doctor, Wright said, "[w]e wanted to make sure that we didn't have her doing anything that would be hazardous to her or her unborn child, okay." [R. 29-8 at 15]. He

8

repeated the idea later when he added, "we wanted to make sure that don't assign her anything that could hurt her or the baby so we have them bring in a note from the doctor listing if she does have any restrictions." [R. 29-8 at 19]. While Wright did state further that he required a note whenever anyone has a medical issue, [*Id.*], this statement equates an early term pregnancy with a medical issue. While there are undoubtedly medical consequences implicated by a pregnancy, it is those consequences which an employer may lawfully evaluate when making employment decisions, not the pregnancy itself. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). "Under the [Pregnancy Discrimination Act], an employer is obliged to ignore a woman's pregnancy and 'to treat the employee as well as it would have if she were not pregnant.'" *Id.* (quoting *Piraino v. International Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996)).

     More importantly, as it relates to Wright's request for the note, he acknowledged that it was the company's policy to follow whatever restrictions a doctor imposed: "[i]f there is no restrictions for any job then that's fine, then they can continue working. And they continue working if we can work within their restrictions." [R. 29-8 at 19]. Wright's statement was essentially an admission of a company policy that strictly followed restrictions contained in doctors' notes. While this may not be such a bad policy in the abstract, Wright manipulated it to require a restriction and seemingly force his hand into terminating Doolin. When Wright told Doolin that he needed a note from her doctor stating that she could no longer work, he was requiring a note from Doolin that would mandate Doolin's discharge. By his own admission, Wright required doctor's notes whenever an employee was pregnant, and according to Doolin, he required one of her that would necessarily preclude her from continued employment. This is direct evidence that Doolin was actually discharged because of her pregnancy in violation of 42

9

U.S.C. § 2000e-2(1)(1).

Even more problematic for Hinkle, however, is Sam Beverage's comment to Doolin on April 24. According to Doolin, "Sam Beverage told [her] that [she] was not to return back to work due to [her] pregnancy." [R. 29-2 at 11]. Beverage also required a note from Doolin's doctor stating that she could no longer work, but effectively added the restriction that she could not work at all even in the period prior to such a doctor's visit. Beverage's statement does not even add the layer that Wright did by requiring a doctor's note prior to discharge. He simply stated that Doolin could not work because she was pregnant. [*See id.*]. This nearly matches, word for word, the example of direct evidence provided by the Sixth Circuit. *See Smith*, 155 F.3d at 805 ("Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'"). In addition, it is the same type of statement found to be direct evidence by the Sixth Circuit in similar Title VII settings. *See Holiday v. City of Chattanooga*, 206 F.3d 637, 647 (6th Cir. 2000) (finding direct evidence of discrimination when a hiring manager told a prospective employee suffering from HIV that she could not "put other employees and the public at risk by hiring you"); *Beery v. Associated Hygienic Products, LLC*, 243 Fed.Appx. 129, 132-33 (6th Cir. 2007) (direct evidence present when employee "told in no uncertain terms that he was being discharged because [the employer] could not accommodate his condition").

Thus, the Court finds that Doolin has proffered sufficient direct evidence of Hinkle's discriminatory motive when it actually discharged her employment. Therefore, the Court must find that Hinkle has not met its burden under the relevant summary judgment standard and deny its motion on this point.

**IV.**

Hinkle also seeks summary judgment on Doolin's FMLA claim. "The FMLA affords an eligible employee up to twelve weeks of leave within a twelve month period when the employee suffers from a serious health condition that makes the employee unable to perform the functions of his position." *Brenneman v. MedCentral Health System*, 366 F.3d 412, 420 (6th Cir. 2004) (internal quotations omitted).

Doolin's FMLA claim is an "entitlement claim," meaning that Doolin alleges that Hinkle interfered with her entitlement to leave under the Act. *See Brenneman*, 366 F.3d at 422 ("The FMLA renders it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right' that it affords." (quoting 29 U.S.C. § 2615(a)(1))). There are five elements Doolin must establish to successfully prove an entitlement claim: "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citation omitted).

Doolin's FMLA claim must fail because there is no scenario under which she can satisfy all five elements. Under the version of the facts outlined above for the pregnancy discrimination claim and maintained by Doolin for this claim, Doolin was actually discharged on April 24. *See supra*, Part III. It was not until the next day, April 25, that Doolin brought the doctor's note to her supervisors and allegedly requested leave. Under this factual scenario, Doolin was no longer an "eligible employee" under the Act. The Sixth Circuit addressed this issue and concluded, "the [Act] affords a remedy only to eligible *employees*. [The plaintiff] was not an 'eligible employee' at the time he received medical attention for his condition. He had already been terminated a

11

week earlier." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (internal citations omitted); *see also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999) (dismissing an FMLA claim because the "[p]laintiff failed to show that he requested a leave under the FMLA to address his nervous condition prior to his resignation). In other words, any requests made post-termination have no bearing on an entitlement claim analysis, and one who makes a request post-termination is not entitled to relief.

If, however, a different account of the facts is credited under which Beverage did not actually discharge Doolin on April 24, her entitlement claim still fails. According to this alternate version of the facts as argued by Hinkle, Doolin simply showed up to work on April 25 with a note from her doctor, and told Jim Wright that she was voluntarily quitting and taking another job. [R. 25-1 at 4; R. 29-8 at 16]. "Where an employee quits his position voluntarily, he may not recover under the FMLA for an allegedly adverse employment action." *Maynard v. Town of Monterey, Tennessee*, 75 Fed.Appx. 491, 494 (6th Cir. 2003) (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999)). If Doolin quit, she was not an eligible employee under this scenario either. Thus, under the factual accounts posited by both Doolin and Hinkle, Doolin was not an eligible employee under the FMLA.

Even if a third factual scenario not advanced by either party is credited, Doolin is still not entitled to FMLA leave under the Act. Under this possible scenario, Doolin was still an eligible employee when she allegedly requested FMLA leave on April 25 and had not yet quit. She presented Hinkle with a note from her doctor stating that she was not to work until at least six weeks after she delivered her child. [R. 29-5]. Her expected date of delivery was October 7. Six weeks after this date would have been in mid-November. Thus, if Doolin's tender of the note is viewed as a request to take FMLA leave as of April 25, it would have been for a period

much longer than the twelve week leave period which the Act entitles individuals to take.

"[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). "Once an employee exceeds his twelve work weeks (or sixty workdays) of FMLA leave, additional leave in the twelve month period is not protected by the FMLA, and termination of the employee will not violate the FMLA." *Coker v. McFaul*, 247 Fed.Appx. 609, 620 (6th Cir. 2007) (quotation omitted); *see also Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 785 (6th Cir. 1998) (holding that when it was indisputable at the twelve week point that the employee could not return to work, the employer did not violate the FMLA in terminating the employee). Thus, Hinkle did not violate the FMLA under this set of facts either. Doolin could not, and did not attempt to, return to work within twelve weeks of her request.

Because Doolin cannot provide sufficient evidence to support an FMLA claim under any factual scenario supported in the record, summary judgment in favor of Hinkle on this claim is appropriate.

### V.

Prior to Hinkle's motion for summary judgment, Doolin maintained a breach of contract claim against Hinkle as well. In her Reply, Doolin concedes that she "has no viable claim for breach of contract on the facts presented." [R. 28 at 29]. Based on this concession, the Court will grant Hinkle's motion for summary judgment on Doolin's breach of contract claim.

### VI.

Accordingly, and for the reasons above, it is hereby **ORDERED** as follows:

1. Summary judgment for Hinkle, with respect to Doolin's FMLA claim and breach

of contract claim, is appropriate and its motion [R. 25] is hereby **GRANTED** with respect to those claims;

2.  Doolin's FMLA claim and breach of contract claim are **DISMISSED WITH PREJUDICE**;

3.  Summary judgment for Hinkle, with respect to Doolin's Title VII and state law pregnancy discrimination claims, is inappropriate and its motion [R. 25] is **DENIED** with respect to those claims;

4.  Hinkle's motion to strike a prior filing and substitute a new supplemental filing [R. 38], is **GRANTED**; and

5.  Doolin's motion to file a surreply [R. 39] is **GRANTED**.

This, the 25th of July, 2012.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge